**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLISON MCCALLISTER, KIMBERLY LAMB, DANIEL THOMPSON, and JANE WHITE THOMPSON, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>MRO CORP., MEDICOPY SERVICES, INC., and DEACONESS HEALTH SYSTEM, INC.,<br><br>Defendants. | Master File No. 2:26-cv-01838-MRP<br><br>**CONSOLIDATED COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Allison McCallister, Kimberly Lamb, Daniel Thompson, and Jane White Thompson ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through the undersigned attorneys, bring this consolidated class action against Defendants MRO CORP. ("MRO"), MEDICOPY SERVICES, INC. ("MediCopy"), and DEACONESS HEALTH SYSTEM, INC. ("DHS") (together, "Defendants") and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs complain and allege upon personal knowledge as to their own actions and counsels' investigations, and upon information and good faith belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiffs bring this consolidated class action lawsuit on behalf of all persons who entrusted Defendants with their sensitive personally identifiable information ("PII") and personal health information ("PHI") (collectively, "Private Information") that were impacted in a data breach that Defendant DHS, a customer of Defendants MRO and MediCopy, publicly disclosed in March 2026 (the "Data Breach" or the "Breach").

2. Plaintiffs' claims arise from Defendants' failure to properly secure and safeguard the Private Information that was entrusted to them, and their accompanying responsibility to store and transfer that Information.

3. Defendant MRO is a Norristown, Pennsylvania-based entity that provides management, administrative, and operating expertise and services primarily to the healthcare industry ("Clients" or "MRO's Clients"), including Defendant DHS. MRO markets itself as "a leading clinical data acquisition and release platform and the KLAS-rated No. 1 provider of release of information (ROI) solutions since 2013," which "empowers healthcare organizations and consumers of clinical data with proven, enterprise-wide solutions that simplify clinical data extraction, tagging, curation and release challenges."[1]

4. Defendant MediCopy is a Nashville, Tennessee-based entity that also provides management, administrative, and operating expertise and services primarily to the healthcare industry, serving its "healthcare clients through secure, compliant, and efficient workflows, and providing requesters of health information with exceptional customer service."[2] In early 2022, Defendant MRO acquired Defendant MediCopy,[3] and MediCopy now serves as a subsidiary within MRO.

5. Defendant DHS is an Evansville, Indiana-based "premiere provider of health care services" which serves "a population of more than 1.5 million in southwestern Indiana, western Kentucky and southeastern Illinois." DHS "consists of 22 wholly owned, joint ventured, sponsored

---

[1] Nicole Hoy, *Clinical Data Release Leader MRO Announces Acquisition of MediCopy*, MRO (Feb. 22, 2022), https://mrocorp.com/press-release/clinical-data-release-leader-mro-announces-acquisition-of-medicopy/.

[2] *Who We Are*, MEDICOPY, https://medicopy.net/who-we-are (last visited Mar. 20, 2026).

[3] Hoy, *Clinical Data Release Leader MRO Announces Acquisition of MediCopy*, *supra* note 1.

or affiliated hospital locations situated throughout the Tri-State."[4] DHS contracts with Defendants MRO and MediCopy to handle patients' release of information requests, which allow healthcare providers to share sensitive patient information with third parties with a patient's authorization.[5]

6. Customers and patients of Defendants or Defendants' clients are required to provide Defendants with, or otherwise authorize Defendants to collect, their sensitive Private Information. By being entrusted with this sensitive Information, Defendants assumed a legal duty to reasonably safeguard it.

7. As reported in March 2026, the Data Breach at issue in this litigation involved unauthorized access to Defendants' network, with initial access detected on January 13, 2026. The Data Breach potentially exposed the PII and PHI of many thousands of individuals.

8. According to Defendant DHS, as well as public reports, "an unauthorized actor accessed MRO's cloud-based file-sharing platform and downloaded an unspecified number of files" on January 13, 2026.[6] The exposed information is reported to include Social Security numbers, full names, dates of birth, medical record numbers, dates of service, health insurance identification numbers and medical records related to treatment received, and other Private Information, though the exact data compromised varies by individual.[7]

---

[4] *About Us,* DEACONESS HEALTH SYSTEMS, https://www.deaconess.com/about-us (last visited Mar. 20, 2026).

[5] Houston Harwood, *Deaconess Patients' Sensitive Data Stolen In Vendor Breach*, EVANSVILLE COURIER & PRESS (updated Mar. 20, 2026), https://www.courierpress.com/story/news/local/2026/03/19/deaconess-health-data-breach-exposes-kentucky-patients-ssns-henderson-morganfield-news-hippa-credit/89196026007/.

[6] *Id.*

[7] *Id.*

9. The Data Breach was a direct result of Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Private Information from the foreseeable threat of a cyberattack.

10. Plaintiffs bring this class action lawsuit individually and on behalf of those similarly situated to address Defendants' inadequate safeguarding of Plaintiffs' and Class Members' Private Information that Defendants collected and maintained, and for failing to provide adequate notice to Plaintiffs and Class Members.

11. Plaintiffs bring claims for negligence, breach of fiduciary duty, breach of implied contract, breach of third-party beneficiary contract, unjust enrichment, and declaratory and injunctive relief. To remedy these violations of law, Plaintiffs and Class Members seek actual damages, statutory damages, restitution, invasion of privacy, and injunctive and declaratory relief (including significant improvements to Defendants' data security protocols and employee training practices); reasonable attorneys' fees, costs, and expenses incurred in bringing this action; and all other remedies this Court deems just and proper.

## PARTIES

### A. Plaintiffs

***Plaintiff Allison McCallister***

12. Plaintiff Allison McCallister is and was, at all times material hereto, a resident and citizen of Henderson County, Kentucky, where she intends to remain.

13. Plaintiff McAllister obtained healthcare services from Deaconess Health and has been a patient with Deaconess for approximately 20 years. Plaintiff has received services from multiple Deaconess locations, including Deaconess Henderson Hospital located in Henderson, Kentucky, and Deaconess Clinic – Union City branch located in Morganfield, Kentucky.

14. As a condition of providing healthcare services to Plaintiff McCallister, Deaconess required Plaintiff to provide it with her Private Information. Deaconess in turn shared Plaintiff McCallister's Private Information with Defendants MediCopy and the MRO Corporation.

15. Plaintiff McCallister believed that Defendants had implemented and maintained reasonable security and practices to protect her Private Information. With this belief in mind, Plaintiff provided her Private Information to Defendants in exchange for receiving healthcare services from Defendants.

16. In connection with providing healthcare services to Plaintiff McCallister, at all relevant times Defendants collected, stored, shared, and maintained Plaintiff McCallister's Private Information on their systems, including the systems involved in the Data Breach.

17. Had Plaintiff McCallister known that Defendants do not adequately protect the Private Information in their possession, she would not have agreed to provide Defendants with her Private Information or obtained healthcare services from Deaconess.

18. Plaintiff McCallister received notice from Defendant alerting her that her Private Information was accessed in the Data Breach. Defendants identified that the impacted facilities include both Deaconess locations Plaintiff has received services from, namely the Deaconess locations in Henderson, Kentucky and Morganfield, Kentucky.

19. As a direct result of the Data Breach, Plaintiff McCallister has suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to

her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

20. Plaintiff suffered actual injury from an increase in spam calls and communications, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.

21. Upon information and belief, as a result of its inadequate cybersecurity, Defendants exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

22. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

23. As a result of the Data Breach, Plaintiff is at present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

24. Plaintiff has a continuing interest in ensuring her Private Information which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

25. Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services, and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

***Plaintiff Kimberly Lamb***

26. Plaintiff Kimberly Lamb is and was, at all times material hereto, a resident and citizen of Henderson County, Kentucky, where she intends to remain.

27. Plaintiff Lamb obtained healthcare services from Deaconess Health and has been a patient with Deaconess Henderson Hospital located in Henderson, Kentucky for Plaintiff Lamb's whole life. Plaintiff last received services in or around July 2026.

28. As a condition of providing healthcare services to Plaintiff Lamb, Deaconess required Plaintiff Lamb to provide it with her Private Information. Deaconess in turn shared Plaintiff Lamb's Private Information with Defendants MediCopy and the MRO Corporation.

29. Plaintiff Lamb believed that Defendants had implemented and maintained reasonable security and practices to protect her Private Information. With this belief in mind, Plaintiff Lamb provided her Private Information to Defendants in exchange for receiving healthcare services from Defendants.

30. In connection with providing healthcare services to Plaintiff Lamb, at all relevant times Defendants collected, stored, shared, and maintained Plaintiff Lamb's Private Information on their systems, including the systems involved in the Data Breach.

31. Had Plaintiff Lamb known that Defendants do not adequately protect the Private Information in their possession, she would not have agreed to provide Defendants with her Private Information or obtained healthcare services from Deaconess.

32. Plaintiff Lamb received a letter from Defendants dated on or around March 20, 2026 notifying her that her Private Information was accessed in the Data Breach. Defendants identified that the impacted facilities include one of the Deaconess locations Plaintiff has received services from, namely the Deaconess location in Henderson, Kentucky.

33. As a direct result of the Data Breach, Plaintiff Lamb has suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value

of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

34. Plaintiff Lamb has been the victim of identity theft as a result of the Data Breach. After the Data Breach, Plaintiff Lamb was notified of a fraudulent inquiry on her credit report. Additionally, through information provided by Plaintiff Lamb's credit monitoring service, she discovered that her Private Information was located on the dark web as well. Plaintiff Lamb spent time and effort researching the details of the Data Breach, monitoring her accounts for activity, and changing her account passwords in the wake of the Data Breach.

35. Plaintiff Lamb also suffered actual injury from the increase in spam calls and communications, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.

36. Upon information and belief, as a result of its inadequate cybersecurity, Defendants exposed Plaintiff Lamb's Private Information for theft by cybercriminals and sale on the dark web.

37. Plaintiff Lamb anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

38. As a result of the Data Breach, Plaintiff Lamb is at present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

39. Plaintiff Lamb has a continuing interest in ensuring her Private Information which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

40. Plaintiff Lamb greatly values her privacy, and would not have provided her Private Information, undertaken the services, and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

***Plaintiff Daniel Thompson***

41. Plaintiff Daniel Thompson is and was, at all times material hereto, a resident and citizen of Union County, Kentucky, where he intends to remain. Plaintiff Thompson obtained healthcare services from Deaconess Health and has been a patient with different Deaconess care centers for over thirty-five years, including the Deaconess Clinic – Union City branch located in Morganfield, Kentucky. Plaintiff last received services in or around early 2026.

42. As a condition of providing healthcare services to Plaintiff Thompson, Deaconess required Plaintiff to provide it with his Private Information. Deaconess in turn shared Plaintiff Thompson's Private Information with Defendants MediCopy and MRO Corporation.

43. Plaintiff Thompson believed that Defendants had implemented and maintained reasonable security practices to protect his Private Information. With this belief in mind, Plaintiff Thompson provided his Private Information to Defendants in exchange for receiving healthcare services from Defendants.

44. In connection with providing healthcare services to Plaintiff Thompson, at all relevant times Defendants collected, stored, shared, and maintained Plaintiff Thompson's Private Information in their systems, including the systems involved in the Data Breach.

45. Had Plaintiff Thompson known that Defendants do not adequately protect the Private Information in their possession, he would not have agreed to provide Defendants with his Private Information or obtained healthcare services from Deaconess.

46. Plaintiff Thompson received a letter from Defendants dated on or around March 20, 2026 notifying him that his Private Information was accessed in the Data Breach. Defendants identified that the impacted facilities include one of the Deaconess locations Plaintiff has received services from, namely the Deaconess location in Morganfield, Kentucky.

47. Plaintiff Thompson spent time and effort researching the details of the Data Breach and monitoring his accounts for activity in the wake of the Data Breach.

48. As a direct result of the Data Breach, Plaintiff Thompson has suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of his Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to his Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

49. Plaintiff Thompson suffered actual injury from the increase in spam calls and communications, suggesting that his Private Information has been stolen and is now in the hands of cybercriminals.

50. Upon information and belief, as a result of its inadequate cybersecurity, Defendants exposed Plaintiff's Private Information for theft by cybercriminals and sale on the dark web.

51. Plaintiff Thompson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

52. As a result of the Data Breach, Plaintiff Thompson is at present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

53. Plaintiff Thompson has a continuing interest in ensuring his Private Information which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

54. Plaintiff Thompson greatly values his privacy, and would not have provided his Private Information, undertaken the services, and paid the amounts that he did if he had known that his Private Information would be maintained using inadequate data security systems.

***Plaintiff Jane White Thompson***

55. Plaintiff Jane White Thompson is and was, at all times material hereto, a resident and citizen of Henderson County, Kentucky, where she intends to remain.

56. Plaintiff White Thompson obtained healthcare services from Deaconess Health and has been a patient with different Deaconess care centers since approximately 2004, including the Deaconess Henderson Hospital located in Henderson, Kentucky. Plaintiff last received services in or around January 2026.

57. As a condition of providing healthcare services to Plaintiff White Thompson, Deaconess required Plaintiff to provide it with her Private Information. Deaconess in turn shared Plaintiff White Thompson's Private Information with Defendants MediCopy and the MRO Corporation.

58. Plaintiff White Thompson believed that Defendants had implemented and maintained reasonable security and practices to protect her Private Information. With this belief in mind, Plaintiff White Thompson provided her Private Information to Defendants in exchange for receiving healthcare services from Defendants.

59. In connection with providing healthcare services to Plaintiff White Thompson, at all relevant times Defendants collected, stored, shared, and maintained Plaintiff's Private Information on their systems, including the systems involved in the Data Breach.

60. Had Plaintiff White Thompson known that Defendants do not adequately protect the Private Information in their possession, she would not have agreed to provide Defendants with her Private Information or obtained healthcare services from Deaconess.

61. Plaintiff White Thompson received a letter from Defendants dated on or around March 20, 2026 notifying her that her Private Information was accessed in the Data Breach. Defendants identified that the impacted facilities include one of the Deaconess locations Plaintiff White Thompson has received services from, namely the Deaconess location in Henderson, Kentucky.

62. As a direct result of the Data Breach, Plaintiff Thompson suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to

further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

63. Plaintiff White Thompson spent time and effort researching the details of the Data Breach, monitoring her accounts for activity, and changing her account passwords in the wake of the Data Breach.

64. Plaintiff White Thompson has also suffered actual injury from the increase in spam calls and communications, suggesting that her Private Information has been stolen and is now in the hands of cybercriminals.

65. Upon information and belief, as a result of its inadequate cybersecurity, Defendants exposed Plaintiff White Thompson's Private Information for theft by cybercriminals and sale on the dark web.

66. Plaintiff White Thompson anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

67. As a result of the Data Breach, Plaintiff White Thompson is at present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

68. Plaintiff White Thompson has a continuing interest in ensuring her Private Information which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

69. Plaintiff White Thompson greatly values her privacy, and would not have provided her Private Information, undertaken the services, and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

**B. Defendants**

70. Defendant MRO Corporation is a corporation formed under the laws of the Commonwealth of Pennsylvania, maintaining its principal place of business located at 1000 Madison Avenue, Suite 100 in Norristown, Pennsylvania 19403.

71. Defendant MediCopy Services, Inc. is a corporation formed under the laws of the State of Tennessee, maintaining its principal place of business located at 8 City Boulevard in Nashville, Tennessee 37209.

72. Defendant Deaconess Health Systems, Inc. is a nonprofit corporation formed under the laws of the State of Indiana, maintaining its principal place of business located at 600 Mary Street in Evansville, Indiana 47747.

## JURISDICTION AND VENUE

73. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the class is a citizen of a different state than Defendants, there are more than 100 members of the class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

74. This Court has personal jurisdiction over Defendant MRO because Defendant MRO maintains its principal place of business in Pennsylvania and conducts substantial business in Pennsylvania and in this District through its principal place of business; because Defendant MRO engaged in the conduct at issue herein from and within this District; and because Defendant MRO otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

75. This Court has personal jurisdiction over Defendant MediCopy because Defendant MediCopy conducts substantial business in Pennsylvania and in this District; because Defendant MediCopy engaged in the conduct at issue herein from and within this District; because Defendant

MediCopy is a subsidiary of Defendant MRO, which maintains it principal place of business in this District; and because Defendant MediCopy otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

76. This Court has personal jurisdiction over Defendant DHS because DHS's patients' Private Information was acquired, stored, shared, accessed, and compromised in this District; because Defendant DHS contracts with Defendant MRO, which maintains its principal place of business in this District; and because Defendant DHS otherwise has substantial contacts with this District and purposely availed itself of the Courts in this District.

77. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, MRO resides in this District, maintains Defendant DHS's patients' Private Information, including that of Plaintiffs and Class Members, in this District, and this District is where a substantial part of the acts, omissions, and events giving rise to Plaintiffs' claims occurred.

## FACTUAL ALLEGATIONS

### A. Overview of Defendants

78. Founded in 2002, MRO is a Pennsylvania-based entity that provides management, administrative, and operating expertise and services primarily to the healthcare industry. MRO markets itself as "a leading clinical data acquisition and release platform and the KLAS-rated No. 1 provider of release of information (ROI) solutions since 2013," which "empowers healthcare organizations and consumers of clinical data with proven, enterprise-wide solutions that simplify clinical data extraction, tagging, curation and release challenges."[8] MRO "connects over 250

---

[8] Hoy, *Clinical Data Release Leader MRO Announces Acquisition of MediCopy*, *supra* note 1.

EHRs, 170,000 providers, 35,000 practices, and 1,100 hospitals while extracting more than 1.3 billion clinical records."[9]

79. Defendant MediCopy, a Tennessee-based entity and a division within MRO, "is a health information management company" which "service[s] its healthcare clients through secure, compliant, and efficient workflows, and providing requesters of health information with exceptional customer service."[10] MediCopy claims that "[p]atients are [its] number one priority," and that it "handle[s] medical requests and form completions with the utmost care, security, and efficiency."[11]

80. Defendant DHS, an Indiana-based entity, is a health care services provider, consisting of 22 wholly owned, joint ventured, sponsored or affiliated hospital locations, that serves more than 1.5 million individuals in southwestern Indiana, western Kentucky and southeastern Illinois.[12] Defendant DHS contracts with Defendants MRO and MediCopy to handle DHS patients' release of information requests, which allows health care providers to share sensitive patient information with third parties with a patient's authorization.[13]

81. In the regular course of their business, Defendants collect and maintain PII/PHI. As a regular part of their business, Defendants require individuals to provide personal information directly or indirectly before they provide their services. Defendants store this information digitally.

82. Defendants are required to implement adequate safeguards to prevent unauthorized use or disclosure of Private Information, including by implementing requirements of the HIPAA

---

[9] *About Us*, MRO, https://mrocorp.com/about-us/ (last visited Mar. 23, 2026).

[10] *MediCopy About Us*, *supra* note 2.

[11] *Id.*

[12] *Deaconess About Us*, *supra* note 4.

[13] Harwood, *Deaconess Patients' Sensitive Data Stolen*, *supra* note 5.

Security Rule[14] and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured protected health information as in the case of the Data Breach complained of herein.

83. In its Privacy Policy, Defendant MRO affirms that it "recognizes [its] responsibility to protect Individually Identifiable Health Information under the regulations implementing HIPAA, other federal and state laws protecting the confidentiality of personal information, and under general, professional ethics[,]"[15] yet MRO maintained inadequate security measures which allowed the Data Breach to occur.

84. In its Privacy / Terms & Conditions, Defendant MediCopy states that it "understands the importance of privacy protection and the responsibility we have to all those that use our services[,]"[16] yet MediCopy maintained inadequate security measures which allowed the Data Breach to occur.

85. In its Joint Notice of Privacy Practices, Defendant DHS acknowledges that it is "required by law to maintain the confidentiality of [its patients'] Protected Health Information (PHI)" and to "notify [its patients] if [their] unsecured protected health information has been breached."[17] DHS further states that it will only use such information for purposes of treatment,

---

[14] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[15] *Privacy Policy*, MRO, https://mrocorp.com/privacy-policy/ (last visited Mar. 23, 2026).

[16] *Privacy / Terms & Conditions*, MEDICOPY, https://medicopy.net/privacy (last visited Mar. 23, 2026).

[17] *Deaconess Joint Notice of Privacy Practices*, DEACONESS HEALTH SYSTEMS (Feb. 16, 2026), https://www.deaconess.com/getcontentasset/d3f74b91-2674-43c4-a747-7940c1337524/5675f749-da0d-4143-b58b-9f9b6d59d84c/notice-of-privacy-practices-dhs.pdf?language=en-us (last visited Mar. 23, 2026).

payment, health care operations, contact, health care coordination and services, business coordination, research purposes, and fundraising.[18]

86. Plaintiffs and Class Members are or were current or former patients or customers of Defendants or Defendants' customers and/or received health-related or other services from Defendants, or otherwise are affiliated or transacted with Defendants, and entrusted Defendants with their PII/PHI or otherwise had their PII/PHI entrusted to Defendants.

87. Because of the highly sensitive and personal nature of the information Defendants acquire and store, Plaintiffs and Class Members reasonably expect that Defendants will, among other things: keep their Private Information confidential; comply with healthcare industry standards related to data security and Private Information; inform them of legal duties and comply with all federal and state laws protecting their Private Information; only use and release their Private Information for reasons that relate to medical care and treatment; and provide adequate notice to them if their Private Information is disclosed without authorization.

**B. Defendants Are HIPAA Covered Business Entities**

88. Defendants are HIPAA covered business entities that provide healthcare services to healthcare providers and, through those providers, Plaintiffs and Class Members. As a condition of obtaining services from Defendants, Plaintiffs and Class Members are required to provide (or have provided on their behalf) Defendants with highly sensitive Private Information. Due to the nature of Defendants' business of providing healthcare and healthcare-related services, Defendants would be unable to engage in their regular business activities without collecting and aggregating Private Information that they know and understand to be sensitive and confidential.

---

[18] *Id.*

89. Defendants are required under federal and state law to maintain the strictest confidentiality of Private Information that they require, receive, and collect, and Defendants are further required to maintain sufficient safeguards to protect that Private Information from being accessed by unauthorized third parties, and to report any unauthorized use or disclosure of Private Information, including incidents that constitute breaches of unsecured protected health information, as in the case of the Data Breach complained of herein.

90. Plaintiffs and Class Members are or were individuals whose sensitive information was maintained by Defendants, and directly or indirectly entrusted Defendants with their Private Information. Plaintiffs and Class Members reasonably expected that Defendants would safeguard their highly sensitive information and keep their Private Information confidential.

**C. The Data Breach Compromised Plaintiffs' and Class Members' PII/PHI**

91. According to the privacy notification provided by Defendant DHS (a customer of Defendants MRO and MediCopy) to state attorneys general (to be disseminated to impacted persons), Defendants were subject to a cybersecurity attack beginning on or about January 13, 2026.[19]

92. Defendant DHS confirmed that the compromised files included, but may not be limited to, names, Social Security numbers, full names, dates of birth, medical record numbers, dates of service, health insurance identification numbers, and medical records related to treatment received.[20]

93. Defendant DHS's disclosures omit pertinent information including how criminals gained access to the files on their systems, what computer systems were impacted, the means and

[19] Harwood, *Deaconess Patients' Sensitive Data Stolen*, *supra* note 5.

[20] *Id.*

mechanisms of the cyberattack, how it determined that the Private Information had been accessed, and, of particular importance to Plaintiffs and Class Members, what actual steps Defendants took following the Data Breach to secure their systems and train their employees to prevent further cyberattacks.

94. Based on Defendant DHS's acknowledgment that Private Information was accessed by an unauthorized party through Defendants' cloud-based file-sharing platform, it is evident that unauthorized criminal actors did, in fact, access Defendants' network and gained access to Plaintiffs' and Class Members' Private Information in an attack designed to acquire that sensitive, confidential, and valuable Information.

95. Moreover, Plaintiffs' counsel's investigation revealed that the compromised Private Information is currently available on the dark web, courtesy of the ransomware gang WorldLeaks, and the posted data set includes over 43,000 files and over 120 GBs of data, including Class Members' Private Information. This data has already been viewed on the dark web thousands of times.

96. On information and belief, as HIPAA-covered business entities that collect, create, store, share, and maintain significant volumes of Private Information, the targeted attack was a foreseeable risk of which Defendants were aware and knew they had a duty to guard against.

97. The targeted attack was expressly designed to gain access to and exfiltrate private and confidential data, including (among other things) the Private Information of Plaintiffs and Class Members.

98. Due to Defendants' inadequate security measures, Plaintiffs and Class Members now face a present, immediate, and ongoing risk of fraud and identity theft and must deal with that threat forever.

99. Defendants had obligations created by HIPAA, contract, industry standards, and common law to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

100. Plaintiffs and Class Members entrusted their Private Information to Defendants, or otherwise had that information provided to Defendants, with the reasonable expectation and mutual understanding that Defendants or anyone who used their Private Information in conjunction with the healthcare services they received would comply with obligations to keep such information confidential and secure from unauthorized access after it received such information.

101. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

102. Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members would not have allowed Defendants or anyone in Defendants' position to receive their PII/PHI had they known that Defendants would fail to implement industry standard protections for that sensitive information.

103. As a result of Defendants' negligent and wrongful conduct, Plaintiffs' and Class Members' highly confidential and sensitive Private Information was left exposed to cybercriminals. The unencrypted Private Information of Plaintiffs and Class Members will end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can now easily access the Private Information of Plaintiffs and Class Members.

**D. Defendants Failed to Comply with HIPAA Requirements**

104. Defendants are covered business associates under HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

105. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[21] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

106. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

107. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

108. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

109. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

[21] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

110. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entities or business associates creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforces.

111. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

112. Additionally, Defendants are required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

113. HIPAA and HITECH also obligated Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

114. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendants to provide notice of the Data Breach to each affected individual "*without unreasonable delay and in no case later than 60 days following discovery of the breach*."[22]

115. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

116. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

117. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, Security Rule Guidance Material.[23] The list of resources includes a link to guidelines set by the National Institute of

---

[22] *Breach Notification Rule*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Mar. 23, 2026) (emphasis added).

[23] *Security Rule Guidance Material*, U.S. DEP'T OF HEALTH & HUM. SERVS., http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Mar. 23, 2026).

Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[24]

**E. Defendants Failed to Follow FTC Guidelines**

118. Defendants were also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

119. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

120. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

121. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone

---

[24] *Guidance on Risk Analysis*, U.S. DEP'T OF HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Mar. 23, 2026).

is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

122. The FTC further recommends that companies not maintain personal information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

123. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

124. These FTC enforcement actions include actions against healthcare providers and partners like Defendants. *See, e.g., In the Matter of LabMD, Inc., A Corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

125. Defendants failed to properly implement basic data security practices.

126. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

127. Defendants were at all times fully aware of their obligation to protect the Private Information entrusted to them. Defendants were also aware of the significant repercussions that would result from their failure to do so.

**F. Defendants Failed to Comply with Industry Standards**

128. As described above, experts studying cybersecurity routinely identify healthcare providers and their business associates as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

129. Several best practices have been identified that at a minimum should be implemented by HIPAA covered business entities like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

130. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

131. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

132. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendants failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

**G. Defendants Owed Plaintiffs and Class Members a Duty to Safeguard Their Private Information**

133. In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Plaintiffs and Class Members.

134. Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

135. Defendants owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

136. Defendants owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

137. Defendants owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

138. Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

139. Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard their computer systems and data and failed to audit, monitor, or ensure the integrity of their vendor's data security practices. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;
b. Failing to adequately protect Private Information;
c. Failing to properly monitor their own data security systems for existing intrusions;
d. Failing to audit, monitor, or ensure the integrity of their vendor's data security practices;
e. Failing to sufficiently train their employees and vendors regarding the proper handling of Private Information;
f. Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;
g. Failing to adhere to HIPAA guidelines and industry standards for cybersecurity as discussed above; and
h. Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' Private Information.

140. Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information by allowing cyberthieves to access their computer networks and systems which contained their unsecured and unencrypted Private Information.

141. Had Defendants remedied the deficiencies in their information storage and security systems and/or those of their vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and Class Members' confidential Private Information.

**H. Defendants Knew That Criminals Target PII/PHI from Healthcare Entities**

142. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the breach.

143. At all relevant times, Defendants knew, or should have known, Plaintiffs' and all other Class Members' PII/PHI were a target for malicious actors. Despite such knowledge, Defendants failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' Private Information from cyberattacks that Defendants should have anticipated and guarded against.

144. "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[25]

---

[25] *9 Reasons Why Healthcare Is the Biggest Target For Cyberattacks*, SWIVELSECURE, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Mar. 23, 2026).

145. Cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, the healthcare compliance company Bluesight found there were 1,160 medical data breaches in 2024, with a staggering 300 million patient records expose—a 26% increase from 2023.[26]

146. In 2025, the frequency of healthcare data breaches "more than doubled," according to Fortified Health Security's 2026 Horizon Report. Though fewer total patient records were implicated in 2025 medical data breaches as compared to 2024, the "[t]otal breach volume in 2025 surpassed 2024 by 112%[,]" indicating a new trend characterized by "[a]ttacks that come faster, hit more healthcare organizations, and strain teams through repetition rather than scale."[27]

147. Healthcare related breaches, in particular, have continued to rapidly increase because electronic patient data is seen as a valuable asset. In fact, entities that store patient information "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[28]

---

[26] *2025 Breach Barometer*, BLUESIGHT (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf (last visited Mar. 23, 2026).

[27] Jill Hughes, *2025: Double the Breaches, but Less Patient Data Compromised*, INFORMA TECHTARGET (Jan. 15, 2026), https://www.techtarget.com/healthtechsecurity/news/366637268/2025-Double-the-breaches-but-less-patient-data-compromised.

[28] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks (last visited Mar. 23, 2026).

148. According to a 2025 report released by IBM Security and the Ponemon Institute, "healthcare recorded the highest average breach cost among industries for the 12th consecutive year[,]" and such breaches "took the longest to identify and contain at 279 days."[29]

149. Private Information is a valuable property right.[30] The value of Private Information as a commodity is measurable.[31] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[32] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[33] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

150. As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, SSNs, PHI/PII, and other sensitive

---

[29] *Cost of a Data Breach Report 2025: The AI Oversight Gap*, IBM SEC. & PONEMON INST., https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last visited Mar. 23, 2026).

[30] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. & COMMC'N TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[31] *See Healthcare Data Breach Statistics 2025: Why Medical Records Are Worth 10× More Than Credit Cards*, PATIENT PROTECT (Nov. 4, 2025), https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards.

[32] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, OECD PUBL'G (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[33] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

information directly on various internet websites, making the information publicly available. This information, from various breaches including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

151. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[34] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[35] A study by Experian found that the "average total cost" of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[36]

152. Private information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[37] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[38] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can

---

[34] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAG. (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[35] *Id.*

[36] Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.

[37] Anita George, *Your Personal Data Is For Sale On the Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[38] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

fetch up to $1,200 to $1,300 each on the black market.[39] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[40] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen SSN or credit card number.[41]

153. Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[42] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[43]

154. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[44]

---

[39] Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MEDIA (July 16, 2013), https://www.scworld.com/news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[40] *In the Dark*, VPNOVERVIEW.COM, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Mar. 23, 2026).

[41] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://nsarchive.gwu.edu/document/18867-national-security-archive-department-justice.

[42] *See* note 34, *supra*.

[43] *Id.*

[44] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

155. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

156. Indeed, cyberattacks against the healthcare industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[45]

157. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals … because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[46]

158. In fact, according to the cybersecurity firm Mimecast, by mid-2025 54% of healthcare organizations had reported ransomware attacks.[47]

159. Defendants were on notice that the FBI has recently been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were

---

[45] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[46] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[47] *Key Ransomware Statistics for Organizations (Updated July 2025)*, MIMECAST, https://www.mimecast.com/content/ransomware-statistics/ (last visited July 9, 2026).

targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[48]

160. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[49]

161. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for Plaintiffs and Class Members.

162. Defendants were on notice that the federal government has been concerned about healthcare company data encryption practices. Defendants knew their employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

163. The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health

---

[48] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited Mar. 23, 2026).

[49] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASSOC. (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[50]

164. Additionally, as companies became more dependent on computer systems to run their business,[51] e.g., working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[52]

165. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on their server(s), amounting to potentially hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

166. As a HIPAA covered business associate, Defendants knew or should have known about their data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in their unprotected files.

167. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

---

[50] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T OF HEALTH & HUM. SERVS., (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[51] *Implications of Cyber Risk for Financial Stability*, BD. OF GOVERNORS OF THE FED. RESERVE SYS., (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[52] *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SEC., (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

168. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly SSNs and PHI—fraudulent use of that information and damage to victims may continue for years.

### I. Theft of PII/PHI Has Grave and Lasting Consequences for Victims

169. Theft of PII/PHI is serious. The FTC warns consumers that identity thieves use PII/PHI to exhaust financial accounts, receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[53]

170. With access to an individual's Private Information, criminals can do more than just empty a victim's bank account—they can also commit all manner of fraud, including: obtaining a driver's license or official identification card in the victim's name but with the thief's picture, using the victim's name and SSN to obtain government benefits, or filing a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's SSN, rent a house, or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest, resulting in an arrest warrant being issued in the victim's name.[54] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

171. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[53] *See What to Know About Identity Theft*, FED. TRADE COMM'N CONSUMER ADVICE (Apr. 2021) https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last visited Mar. 23, 2026).

[54] *See Warning Signs of Identity Theft*, FED. TRADE COMM'N, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited Mar. 23, 2026).

on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

172. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or SSN. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

173. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[55] With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

---

[55] "Fullz" is jargon for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, SSN, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SEC. (Sept. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

174. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was accessed in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

175. The existence and prevalence of "Fullz" packages means that the Private Information stolen as a direct result of the Data Breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiffs and the other Class Members.

176. Thus, even if certain information was not stolen in the Data Breach, criminals can still easily create a comprehensive "Fullz" package.

177. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

178. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on dark web black markets for years.

179. Cybercriminals may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[56]

---

[56] *Report to Congressional Requesters: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T ACCOUNTABILITY OFF. (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

180. For example, it is believed that certain highly sensitive personal information compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related unemployment benefits.

181. The Private Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. These risks are both certainly impending and substantial. As the FTC has reported, if cyber thieves get access to a person's highly sensitive information, they will use it.[57]

182. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that most victims of identity crimes need more than a month to resolve issues stemming from identity theft and some need over a year.[58]

183. Theft of SSN also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of his or her SSN, and a new identification number will not be provided until after the victim has suffered the harm. In other words, preventative action to defend against the possibility of misuse of an SSN is not permitted.

---

[57] Ari Lazarus, *How Fast Will Identity Thieves Use Stolen Info?*, MIL. CONSUMER (May 24, 2017), https://www.militaryconsumer.gov/blog/how-fast-will-identity-thieves-use-stolen-info.

[58] *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces*, IDENTITY THEFT RES. CTR. (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.

184. Even then, a new SSN may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[59]

185. Due to the highly sensitive nature of SSNs, theft of SSNs in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Jim Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[60]

186. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[61]

187. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—including names and SSNs.

---

[59] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[60] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.

[61] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

188. There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her SSN was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

189. For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[62]

190. It is within this context that Plaintiffs and all other Class Members must now live with the knowledge that their Private Information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

191. A study by the Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:

[62] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS & INFORMATICS 9, 12 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.




192. Victims of the Data Breach, like Plaintiffs and Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their privacy and credit because of the Data Breach.[63]

193. As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and Class Members must now take the time and effort (and spend the money) to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services every year for the rest of their lives, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions and healthcare providers, closing or modifying financial accounts, and closely

---

[63] *Guide for Assisting Identity Theft Victims*, FED. TRADE COMM'N (Sept. 2013), http://www.global-screeningsolutions.com/Guide-for-Assisting-ID-Theft-Victims.pdf.

reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

194. Plaintiffs and Class Members have suffered or will suffer actual harms for which they are entitled to compensation, including but not limited to the following:

a. Trespass, damage to, and theft of their personal property, including Private Information;

b. Improper disclosure of their Private Information;

c. The imminent and certainly impending injury flowing from actual and potential future fraud and identity theft posed by their Private Information being in the hands of criminals and having already been misused;

d. The imminent and certainly impending risk of having their confidential information used against them by spam callers to defraud them;

e. Damages flowing from Defendants' untimely and inadequate notification of the Data Breach;

f. Loss of privacy suffered as a result of the Data Breach;

g. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably expended to remedy or mitigate the effects of the data breach;

h. Ascertainable losses in the form of deprivation of the value of their Private Information for which there is a well-established and quantifiable national and international market;

i. The loss of use of and access to their credit, accounts, and/or funds;

j. Damage to their credit due to fraudulent use of their Private Information; and

k. Increased cost of borrowing, insurance, deposits, and other items which are adversely affected by a reduced credit score.

195. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which remains in the possession of Defendants, is protected from further public disclosure by the implementation of better employee training and industry standard and statutorily compliant security measures and safeguards. Defendants have shown themselves to be wholly incapable of protecting Plaintiffs' and Class Members' Private Information.

196. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries. For this reason, Defendants knew or should have known about these dangers and strengthened their data security accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet they failed to properly prepare for that risk.

**J. The Data Breach Was Foreseeable and Preventable**

197. Data disclosures and data breaches are preventable.[64] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[65] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[66]

---

[64] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thomson ed., 2012).

[65] *Id.* at 17.

[66] *Id.* at 28.

198. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner *so that a data breach never occurs*."[67]

199. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[68]

200. Plaintiffs and Class Members entrusted their Private Information to Defendants. Plaintiffs and Class Members understood and expected that Defendants or anyone in Defendants' position would safeguard their Private Information against cyberattacks, delete or destroy Private Information that Defendants were no longer required to maintain, and timely and accurately notify them if their Private Information was compromised.

**K. Plaintiffs' and Class Members' Damages**

201. To date, Defendants have done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach. Defendants only offered minimal credit monitoring services, but they did not disclose how they determined eligibility.[69] Not only did Defendants fail to provide any ongoing credit monitoring or identity protection services for all individuals impacted by the Data Breach, but the credit monitoring does nothing to compensate Class Members for damages incurred and time spent dealing with the Data Breach.

---

[67] *Id.* (emphasis added).

[68] *See How to Protect Your Networks from RANSOMWARE*, at 3, FED. BUREAU OF INVESTIGATION, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Mar. 23, 2026).

[69] *See Notice of Data Incident*, DEACONESS HEALTH SYSTEM, https://www.deaconess.com/special-pages/notice-of-data-incident (last visited Mar. 23, 2026).

202. Plaintiffs and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

203. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from fraud and identity theft. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

204. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

205. Plaintiffs and Class Members have and will also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

206. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring financial and other sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and

f. Closely reviewing and monitoring SSNs, bank accounts, and credit reports for unauthorized activity for years to come.

207. Defendants entirely failed to provide any compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information.

208. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per class member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

209. Plaintiffs and Class Members suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to: (a) damage to and diminution in the value of their Private Information, a form of property that Defendants obtained from Plaintiffs and Class Members; (b) violation of their privacy rights; (c) imminent and impending injury arising from the increased risk of identity theft and fraud; and (d) emotional distress.

210. Further, as a result of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy with respect to that information.

211. As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and are at a present, imminent, and increased risk of future harm.

212. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online, is properly encrypted, and that access to such data is password protected.

213. Many failures laid the groundwork for the occurrence of the Data Breach, starting with Defendants' failure to incur the costs necessary to implement adequate and reasonable cybersecurity training, procedures, and protocols that were necessary to protect Plaintiffs' and Class Members' Private Information.

214. Defendants maintained the Private Information entrusted to them in an objectively reckless manner, making that Private Information vulnerable to unauthorized disclosure.

215. Defendants knew, or reasonably should have known, of the importance of safeguarding Private Information and of the foreseeable consequences that would result if Plaintiffs' and Class Members' Private Information was stolen, including the significant costs that would be placed on Plaintiffs and Class Members as a result of the breach.

216. The risk of improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' Private Information from that risk left the Private Information in a dangerous condition.

217. Defendants disregarded the rights of Plaintiffs and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that the Private Information was protected against unauthorized intrusions; (ii) failing to disclose that they did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

## CLASS ALLEGATIONS

218. Plaintiffs bring this Class Action individually and on behalf of all members of the following class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23:

> All persons in the United States whose Private Information was compromised in the Data Breach, including all who are sent notice of the Data Breach (the "Class").

219. Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, officers, agents, and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and any and all federal, state, or local governments; and the judge(s) presiding over this matter and the clerks and family members of said judge(s).

220. Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

221. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

222. **Numerosity**: The Class Members are so numerous that joinder of all members in a single proceeding would be impracticable. Upon information and belief, the proposed Class includes thousands of individuals whose Private Information was exposed in the Data Breach. The Class Members are identifiable within Defendants' records inasmuch as Defendants have already provided them with notification of the Breach and/or otherwise maintain their information through Defendants' regular course of business.

223. **Commonality and Predominance**: Common questions of law and fact exist as to all Class Members and predominate over any potential questions affecting only individual Class Members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' PII/PHI from unauthorized access and disclosure;

b. Whether the computer systems and data security practices employed by Defendants to protect Plaintiffs' and Class Members' Private Information violated the FTC Act and/or HIPAA, and/or state laws and/or Defendants' other duties discussed herein;

c. When Defendants actually learned of the Data Breach;

d. Whether Defendants failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

e. Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

f. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' Private Information;

g. Whether Defendants adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

h. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and Class Members;

i. Whether Defendants' actions and inactions alleged herein constitute gross negligence;

j. Whether Defendants breached their duties to protect Plaintiffs' and Class Members' Private Information; and

k. Whether Plaintiffs and all other Class Members are entitled to damages and the measure of such damages and relief.

224. Defendants engaged in a common course of conduct, giving rise to the legal rights sought to be enforced by Plaintiffs, individually and on behalf of all other Class Members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

225. **Typicality**: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed Class Members, had Private Information compromised in the Data Breach. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class Members.

226. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs are adequate representatives of the Class and have no interests adverse to, or in conflict with, the Class that Plaintiffs seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

227. **Superiority**: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class Members to individually seek redress from Defendants' wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

228. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that

experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

229. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

230. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

231. Unless a class-wide injunction is issued, Defendants may continue in their failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendants may continue to act unlawfully as set forth in this complaint.

232. Further, Defendants have acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiffs and the Class)

233. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

234. Defendants collected the Private Information of Plaintiffs and Class Members in the ordinary course of providing services directly or indirectly to Plaintiffs and Class Members.

235. Defendants owed a duty to Plaintiffs and all other Class Members to exercise reasonable care in safeguarding and protecting their Private Information in Defendants' possession, custody, or control. Defendants' duty included a responsibility to implement processes by which they could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach. Defendants' duties arose under common law, HIPAA and FTC guidance, as well as Defendants' own respective privacy policies.[70]

236. Defendants knew, or should have known, the risks of collecting and storing Plaintiffs' and Class Members' Private Information and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted healthcare service providers in recent years.

237. Given the nature of Defendants' business, the sensitivity and value of the Private Information they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

238. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Private Information entrusted to them—including Plaintiffs' and Class Members' Private Information.

239. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information by failing

[70] *See supra* notes 15-17.

to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class Members' Private Information to unauthorized individuals.

240. Defendants' duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendants and the individuals whose sensitive Private Information Defendants acquired and stored. Defendants were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

241. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

242. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiffs and Class Members, Plaintiffs' and Class Members' Private Information would not have been compromised.

243. Defendants' duties also arise from Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

244. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with industry standards.

245. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

246. Defendants breached their duties to Plaintiffs and Class Members under HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

247. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendants' systems.

248. Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act, HIPAA, and similar state statutes were intended to protect.

249. Moreover, the harm that has occurred is the type of harm the FTC Act, HIPAA, and similar state statutes are intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

250. Defendants' flagrant violations of the FTC Act and HIPAA amount to negligence per se.

251. As a result of Defendants' negligence per se, Plaintiffs and Class Members have been harmed and have suffered damages including, but not limited to: damages arising from

identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

252. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and all other Class Members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) deprivation of the value of their Private Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

253. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

254. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to, e.g., (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
**(On behalf of Plaintiffs and the Class)**

255. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

256. Plaintiffs and Class Members, either directly or indirectly, gave Defendants their Private Information in confidence, believing that Defendants would protect that information. Plaintiffs and Class Members would not have provided Defendants with this information had they known it would not be adequately protected. Defendants' acceptance and storage of Plaintiffs' and Class Members' Private Information created a fiduciary relationship between Defendants and Plaintiffs and Class Members. In light of this relationship, Defendants must act primarily for the benefit of Plaintiffs and Class Members, which includes safeguarding and protecting Plaintiffs' and Class Members' Private Information.

257. Defendants accepted and used Plaintiffs' and Class Members' Private Information for their own pecuniary benefit and accepted the Private Information with full knowledge of the need to maintain it as confidential, the need to implement appropriate data security measures, and the significant harm that would result to Plaintiffs and Class Members if the confidentiality of their Private Information was breached.

258. Defendants were in a superior position of trust and authority to Plaintiffs and Class Members.

259. Plaintiffs and Class Members had no way to ensure that Defendants' data security measures were adequate and no way to influence or verify the integrity of Defendants' data security posture.

260. Defendants have a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of their relationship. They breached that duty by failing

to properly protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard the Private Information of Plaintiffs and Class Members they collected. Defendants also breached their fiduciary duty by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

261. As a direct and proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information, which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the Private Information compromised as a result of the Data Breach; (vii) actual or attempted fraud; (viii) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (ix) the diminished value of Defendants' services they received.

**<u>COUNT III</u>**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Class)**

262. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

263. Defendants required Plaintiffs and the Class to provide and entrust their Private Information to Defendants as a condition of obtaining Defendants' services.

264. Plaintiffs and the Class entered into implied contracts with Defendants under which Defendants agreed to safeguard and protect their Private Information and to timely and accurately notify Plaintiffs and the Class if their Private Information had been breached and compromised.

265. Defendants entered into implied contracts with Plaintiffs and the Class by collecting their Private Information and promising to safeguard it against unauthorized disclosures. Defendants entered into implied contracts with Plaintiffs and the Class by accepting, collecting, storing, and maintaining the Private Information entrusted to it in exchange for safeguarding the Private Information from unauthorized disclosures. Defendants breached the implied contracts with Plaintiffs and the Class by failing to protect Plaintiffs' and the Class's Private Information from cybercriminals.

266. Defendants promised, and warranted to, Plaintiffs and the Class, to maintain the privacy and confidentiality of the Private Information Defendants collected from Plaintiffs and the Class and to keep such information safeguarded against unauthorized access and disclosure.

267. Defendants' adequate protection of Plaintiffs' and the Class's Private Information was a material aspect of these implied contracts.

268. Plaintiffs and Class Members conferred a monetary benefit on Defendants in that Plaintiffs and Class Members were required to pay Defendants for services, a portion of which should have been specifically allocated towards adequate data security.

269. Without the Private Information provided by Plaintiffs and the Class, Defendants could not derive revenue from their regular business activities. A portion of the revenue derived from the services provided to Plaintiffs and the Class was to be used to provide a reasonable level of data security and reasonable data security practices. The amount of revenue to be allocated to data security is known to Defendants.

270. Defendants accepted possession of Plaintiffs' and the Class's Private Information for the purpose of providing goods and services and implicitly agreed to protect their Private Information from data breaches and keep it confidential and secured.

271. The implied promise included consideration beyond those pre-existing general duties owed under state and federal regulations. The additional consideration included implied promises to take adequate steps to comply with specific industry data security standards and FTC guidelines and industry standards on data security.

272. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of their agents is restricted and limited to achieve an authorized (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the Private Information against data breaches; (5) applying or requiring proper encryption; (6) multifactor authentication for access; and (7) other steps to protect against foreseeable data breaches.

273. Based on this implicit understanding, Plaintiffs and the Class accepted Defendants' offers and provided Defendants with their Private Information to obtain services.

274. Plaintiffs and the Class would not have permitted their Private Information to be collected and stored by Defendants had they known that Defendants would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

275. Plaintiffs and the Class fully performed their obligations under their implied contracts with Defendants.

276. Defendants materially breached the implied contracts by failing to safeguard Plaintiffs' and the Class's Private Information, by failing to adhere to FTC guidelines and industry

standards, or by ensuring that their provider had adequate safeguards to protect the Private Information, and by failing to provide Plaintiffs and the Class with timely and accurate notice of the Data Breach.

277. As a result of Defendants' failures to fulfill the data security protections promised, Plaintiffs and the Class did not receive the full benefit of their bargains with Defendants, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiffs and the Class were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

278. As a direct and proximate result of Defendants' breach of their implied contracts with Plaintiffs and the Class and the consequential Data Breach, Plaintiffs and the Class have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendants.

279. Upon information and belief, Defendants have not provided Plaintiffs and the Class with information regarding the root cause of the Data Breach and the steps Defendants are taking to ensure that Private Information remains safe and protected from further disclosures.

280. The losses and damages Plaintiffs and the Class sustained (as described above) were the direct and proximate result of Defendants' breach of their implied contracts with Plaintiffs and the Class.

281. Plaintiffs and the Class are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

**COUNT IV**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On behalf of Plaintiffs and the Class Against Defendant MRO)**

282. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

283. Defendant MRO entered into contracts, written or implied, with its Clients to perform services. Upon information and belief, these contracts are virtually identical between and among Defendant MRO and its Clients around the country whose patients, including Plaintiffs and Class Members, were affected by the Data Breach.

284. In exchange, Defendant MRO agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiffs and the Class.

285. These contracts were made expressly for the benefit of Plaintiffs and the Class, as Plaintiffs and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant MRO and its Clients. Defendant MRO knew that if it were to breach these contracts with its Clients, its Clients' patients—Plaintiffs and Class Members—would be harmed.

286. Defendant MRO breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiffs and Class Members thereof.

287. Plaintiffs and the Class were harmed by Defendant MRO's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

288. Plaintiffs and Class Members are also entitled to their costs and attorneys' fees incurred in this action.

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Class)**

289. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

290. This claim is pleaded in the alternative to any current or future contract claims, pursuant to Fed. R. Civ. P. 8(d).

291. Plaintiffs and Class Members conferred a monetary benefit, directly or indirectly, upon Defendants in the form of monies paid for services or other services.

292. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiffs and Class Members. Defendants also benefitted from the receipt of Plaintiffs' and Class Members' Private Information.

293. As a result of Defendants' conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

294. Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members because Defendants failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and Class Members paid for and that were otherwise mandated by federal, state, and local laws, and industry standards.

295. Defendants should be compelled to provide for the benefit of Plaintiffs and Class Members all unlawful proceeds received as a result of their misconduct and the Data Breach.

**COUNT VI**
**INVASION OF PRIVACY**
**(On behalf of Plaintiffs and the Class)**

296. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

297. Plaintiffs and Class Members had a reasonable expectation of privacy in the Private Information that Defendants possessed and/or continue to possess.

298. By failing to keep Plaintiffs' and Class Members' Private Information safe, and by misusing and/or disclosing their Private Information to unauthorized parties for unauthorized use, Defendants invaded Plaintiff's and Class members' privacy by:

a. Intruding into their private affairs in a manner that would be highly offensive to a reasonable person; and

b. Publicizing private facts about Plaintiff and Class members, which is highly offensive to a reasonable person.

299. Defendants knew, or acted with reckless disregard of the fact that, a reasonable person in Plaintiffs' position would consider Defendants' actions highly offensive.

300. Defendants invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by misusing and/or disclosing their private information without their informed, voluntary, affirmative, and clear consent.

301. As a proximate result of such misuse and disclosures, Plaintiffs' and Class Members' reasonable expectation of privacy in their Private Information was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiffs' and Class Members' protected privacy interests.

302. In failing to protect Plaintiffs' and Class Members' Private Information, and in misusing and/or disclosing their Private Information, Defendants have acted with malice and

oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such Information kept confidential and private, in failing to provide adequate notice, and in placing its own economic, corporate, and legal interests above the privacy interests of its millions of patients. Plaintiffs, therefore, seek an award of damages, including punitive damages, on behalf of themselves and the Class.

**COUNT VII**
**DECLARATORY AND INJUNCTIVE RELIEF**
**(On behalf of Plaintiffs and the Class)**

303. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

304. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

305. Defendants owe a duty of care to Plaintiffs and Class Members that require them to adequately secure Plaintiffs' and Class Members' Private Information.

306. Defendants still possess the Private Information of Plaintiffs and Class Members.

307. Defendants have not satisfied their contractual obligations and legal duties to Plaintiffs and Class Members.

308. Actual harm has arisen in the wake of the Data Breach regarding Defendants' contractual obligations and duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information and Defendants' failure to address the security failings that led to such exposure.

309. There is no reason to believe that Defendants' employee training and security measures are any more adequate now than they were before the Breach to meet Defendants' contractual obligations and legal duties.

310. Plaintiffs and Class Members, therefore, seek a declaration (1) that Defendants' existing data security measures do not comply with their contractual obligations and duties of care to provide adequate data security, and (2) that to comply with their contractual obligations and duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to, the following:

a. Prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

b. Ordering that Defendants engage internal security personnel to conduct testing, including audits on Defendants' systems, on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

c. Requiring Defendants to protect, including through encryption, all data collected through the course of their businesses in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

d. Ordering that Defendants engage third-party security auditors and internal personnel to run automated security monitoring;

e. Ordering that Defendants audit, test, and train their security personnel and employees regarding any new or modified data security policies and procedures;

f. Ordering that Defendants purge, delete, and destroy, in a reasonably secure manner, any Private Information not necessary for their provision of services;

g. Ordering that Defendants conduct regular database scanning and security checks;

h. Prohibiting Defendants from maintaining Private Information of Plaintiffs and Class Members on a cloud-based database;

i. Requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

j. Ordering that Defendants routinely and continually conduct internal training and education to inform internal security personnel and employees how to safely share and maintain highly sensitive Private Information, including but not limited to, patient personally identifiable information and patient protected health information;

k. Requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding paragraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

l. Requiring Defendants to meaningfully educate all Class Members about the threats they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

m. Requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment; and

n. Such other and further relief as this Court may deem just and proper.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other Class Members, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiffs as the Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, individually and on behalf of the Class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard Private Information and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims so triable.

Dated: July 16, 2026

Respectfully submitted,

*/s/ Andrew W. Ferich*
Andrew W. Ferich (PA I.D. No. 313696)
Brian J. Devall (*pro hac vice* forthcoming)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com
bdevall@ahdootwolfson.com

Benjamin F. Johns (PA I.D. No. 201373)
Samantha E. Holbrook (PA I.D. No. 311829)
**SHUB JOHNS & HOLBROOK LLC**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
Facsimile: (856) 210-9088
bjohns@shublawyers.com
sholbrook@shublawyers.com

*Attorneys for Plaintiffs and the Putative Class*